IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CATHERINE H. SNELLING, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | 5:05-CV-46 (DF) |
| | : | |
| STARK PROPERTIES, INC. d/b/a | : | |
| JONES PETROLEUM COMPANY, | : | |
| INC., | : | |
| | : | |
| Defendant. | : | |

## O R D E R

Plaintiff Catherine H. Snelling[1] (Snelling) initiated this action under the Family and Medical Leave Act of 1993 (FMLA or Act), 29 U.S.C.A. § 2601, *et seq.* (West 1999), alleging that her former employer, Defendant Stark Properties, Inc., d/b/a Jones Petroleum Company, Inc. (JPC), interfered with her statutory right to seek medical leave under the Act and subsequently retaliated against her by terminating her employment. Snelling alleges that these actions violated § 2615(a) of the Act, and she seeks injunctive and monetary relief under § 2617, the Act's civil-enforcement provision. JPC has moved for summary judgment (doc. 20). The Court has thoroughly considered the summary-judgment record, the parties' briefs, and the relevant law. For the reasons that follow, JPC's motion for summary judgment is denied.

---

[1] Snelling remarried in February 2005, after filing this lawsuit, and is now known as Catherine Heather McDonald. (Snelling Dep., doc. 22, at 6.) The Court will refer to her as Snelling throughout this Order.

# I. BACKGROUND[2]

JPC is a petroleum products supplier engaged in the wholesale and retail sale of motor fuels. (Def.'s Stmt. Undisputed Mat. Facts ¶ 1.) It is headquartered in Jackson, Georgia, and buys, sells, leases, and operates convenience stores throughout the state. (*Id.*) Snelling began working in JPC's accounting department on June 21, 2000, and at that time was mainly responsible for auditing the paperwork from JPC's convenience stores. (*Id.* ¶ 2; Snelling Dep., doc. 22, at 48.) While at JPC, Snelling reported primarily to Connie Lewis, the accounting supervisor, and only occasionally near the beginning of her employment to Sheila Millwood, the office manager. (Def.'s Stmt. Undisputed Mat. Facts ¶ 3.) JPC's human resources and benefits manager was Thelma Carter. (*Id.*)

During the course of her employment with JPC, Snelling was permitted to take time off work, with no adverse repercussions, to attend technical-college classes, to work on a charter school project, to take her daughter to work at one of JPC's convenience stores, and to recover from a reflux-related illness. (Snelling Dep., doc. 22, at 34-36; 39-44; 45-46; 54-55; 55-56; 73-74.) At some point during her employment, Lewis told Snelling that she should "cut back" on taking personal telephone calls while at work. (*Id.* at 84.) This suggestion was made in response to information Millwood related to Lewis. In addition, on "maybe two or three" occasions, Lewis discussed with Snelling what Millwood perceived to be Snelling's problems with work attendance. (*Id.* at 63, 87.)

---

[2] The Court recounts the facts and views the evidence in the light most favorable to Snelling, the nonmoving party. *See* **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 249 (1986).

After a couple of years at JPC, Snelling became bored with her job and, after reporting her boredom to Lewis, was assigned "all these new responsibilities in addition to what [she] was [already] doing." (*Id.* at 50.)  As part of her new responsibilities, Snelling was tasked with keeping track of letters of credit and insurance information related to JPC's leased convenience stores.  (*Id.* at 50, 87-88.)  As time went by, these new responsibilities, coupled with her increased auditing duties, became too much to handle, and Snelling testified in her deposition that "[she] was not able to keep up with it." (*Id.* at 89.)  Snelling informed both Lewis and Millwood as much, stating that "[she] was concerned [she] was not able to keep up on it" and that "[she] was doing [her] best with the letters of credit, but with the insurance information, [she] was having a problem with it." (*Id.* at 91.)  In response to Snelling's growing concerns about her ability to manage the work, Lewis and Millwood assured her that by January 2003 the job of keeping track of the letters of credit and the insurance information on the leased stores would be reassigned to someone else.  (*Id.* at 92.)

Sometime before February 12, 2003, the chain of events giving rise to this lawsuit was set into motion.  One day while at work Snelling took a stack of papers—insurance information concerning some of the leased convenience stores—and placed it somewhere[3] in a vacant office in her building.  (*Id.* at 93.)  Snelling knew the papers were important to JPC because they contained the expiration dates for each of the insurance policies on the

---

[3] Snelling stated: "I don't know if it was on the desk, on a book shelf, I don't know.  I just put it on top of something." (*Id.* at 94.)

leased stores.  (*Id.* at 96.)  Snelling told Lewis where she was moving the papers, and Lewis told her to make sure that Millwood knew where they were being put.  But Snelling considered it unnecessary to tell Millwood because Millwood had already reviewed the documents.  Snelling did not inform Lewis of her failure to tell Millwood the new location of the documents because it "slipped [her] mind."  (*Id.*)

On the morning of February 12th, after discovering the insurance documents in the vacant office, Millwood approached Snelling and asked her why she put them in there.  (*Id.* at 102.)  Snelling explained that her own office was too small, that she was no longer working with the documents, and that Millwood had already reviewed them.  (*Id.* at 103.)  Following this exchange, during which Snelling became "upset" and "excited," Snelling was called in to Lewis's office to discuss the matter further with Lewis and Millwood.  (*Id.* at 102, 104.)  During the discussion, Snelling admitted both that Lewis had told her to inform Millwood about the location of the documents and that she had neglected to do so.  (*Id.* at 104-105.)  Snelling was not threatened with disciplinary action at the meeting, but she was nevertheless very upset because in her view Millwood was accusing her of being a liar.  (*Id.* at 106-107.)

Soon after the conversation concluded, Snelling returned to her office, paid some personal bills, and clocked out of work, taking only her purse and nothing else.  (*Id.* at 108.)  It was around 12:30 p.m. when she left.  (*Id.* at 110.)  On the way home, Snelling ran her car off the road into a ditch.  (*Id.*)  She was alone at the time of the accident.  (*Id.* at 111.)  Her car was not damaged, she was not physically injured, and she did not file an accident report

or call the police or her insurance agent.  (*Id.*)  Snelling temporarily forgot how to get to her house.  (*Id.*)

Snelling eventually maneuvered her car back onto the road and remembered the way home.  (*Id.* at 112.)  When she got home, she found her daughter resting on the couch. Snelling had been crying and her daughter asked what was wrong with her.  Snelling had trouble speaking, and asked her daughter to call JPC to report what had happened.  (*Id.*)  Her daughter tried to reach Lewis, Millwood, and Carter, but was unsuccessful.  (*Id.* at 114.)  She finally left a message for Lewis explaining that her mother had been in an accident and that she would not be returning to work.  (*Id.*; Def.'s Stmt. Undisputed Mat. Facts ¶ 31; Pl.'s Response to Def.'s Stmt. Undisputed Mat. Facts ¶ 31.)  Later that evening, Snelling received a message on her answering machine from Millwood, in which Millwood expressed concern about the accident.  (*Id.* at 126.)

Soon after the car accident Snelling attempted to contact Dr. McClendon at the Eagle's Landing Family Clinic.  (*Id.* at 116.)  Though she could hardly speak, Snelling told the receptionist at the clinic that she had been involved in an accident and needed to come in for an appointment.  (*Id.*)  Snelling reported to the clinic immediately and was seen by a physician's assistant (PA).  (*Id.* at 117.)  She did not see or talk to Dr. McClendon.  (*Id.*)

Snelling told the PA what happened at work that morning and that she had run off the road on the way home.  The PA told Snelling that she wanted to put her on medical

leave until the end of March—a period of nearly six weeks.[4]  (*Id.*)  At the time, Snelling was already being prescribed anti-anxiety and anti-depressant medication, and the PA determined that her dosage needed to be increased from 37.5 to 150 (presumably milligrams).  (*Id.* at 118-119.)  The PA informed Snelling that she would need to obtain a note excusing her absence from work and that she would need to have JPC provide her with "the forms to fill out for Family Medical Leave."  (*Id.* at 18.)  At the conclusion of their meeting, the PA provided Snelling with a return-to-work certificate, which stated that Snelling would be under a doctor's care from February 12th to February 14th and that she would need to be out of work until February 15th.  (*Id.* at 123-124; Def.'s Ex. 5.)

The following morning, February 13th, Snelling went back to JPC to give Lewis the return-to-work certificate from the PA.  (Snelling Dep., doc. 22, at 124.)  She told Lewis that she had had an anxiety attack the day before and that her health care provider wanted to place her on leave.  (*Id.* at 162.)  While she was meeting with Lewis, Millwood came in the office and asked Snelling a question; Snelling told Millwood that "under the doctor's advice" she was not to have a conversation with Millwood "for fear [she] might get upset again and have another anxiety attack."  (*Id.* at 125.)  Complying with the PA's suggestion, Snelling requested the appropriate FMLA forms while at JPC, but Millwood told her she could not find them.  Millwood asked Snelling to come back later in the afternoon.  (*Id.* at 127, 128.)

---

[4] Snelling testified in her deposition that there was no discussion between her and the PA regarding how the PA arrived at that recommendation.  (*Id.* at 118.)

Snelling returned to JPC that afternoon, but again left empty-handed when the FMLA paperwork still could not be found.  (*Id.* at 128.)

Snelling went back to JPC the following morning, February 14th, and met with Lewis and Thelma Carter (from human resources).  Snelling gave them a handwritten note, which stated "family medical leave act paperwork" and "short term disability paperwork."  (Def.'s Ex. 6.)  Snelling received two documents: (1) a blank *employer* (not employee) form to fill out regarding short-term disability benefits and (2) an FMLA flyer containing the following heading at the top: "Your Rights Under The Family and Medical Leave Act of 1993."[5] (Snelling Dep., doc. 22, at 129; Def.'s Exs. 7 & 8.)  After Snelling returned home with these documents, she received a phone call from a nurse at the clinic who asked if she had gotten the proper forms.  (*Id.* at 131.)  Snelling told the nurse what she had received, and the nurse told her that she had been given the wrong disability-benefits form.  (*Id.* at 131, 132.)  That she did not receive the correct form was confirmed by a telephone call to the insurance company after Snelling had partially filled it out.  (*Id.* at 134.)  The insurance company, Shenandoah Life, subsequently e-mailed Snelling the correct form—the one intended to be filled out by *employees* (not employers).  (*Id.* at 135; Def.'s Ex. 9.)

On one of Snelling's visits to JPC in the days following the accident, Carter asked her about the nature of the disability she was claiming under the insurance policy.  Snelling does

_____

[5] Snelling testified that she had seen this FMLA document before because it "look[ed] like what was pasted in the copy machine room."  (*Id.* at 131.)

not recall to what extent she told Carter about her condition.  Snelling told Carter to check with Lewis because Lewis knew all about it; Snelling testified in her deposition that "[she] was too upset to talk about it."  (Snelling Dep., doc. 22, at 137.)

The following Monday morning, February 17th, Snelling returned to JPC with a second return-to-work certificate and left it with the receptionist in an envelope with Carter's name on it.  (*Id.* at 144.)  This certificate stated that Snelling would be unable to return to work until March 31st.  (Def.'s Ex. 16.)  JPC contends that it never received this certificate and that it did not find out about its existence until an administrative disability hearing held on April 29, 2003—some three and a half months after Snelling claims to have delivered it to JPC.  (Snelling Dep, doc. 22, at 187.)  Before arriving at JPC on the morning of the 17th, Snelling had spoken to Carter by telephone and told her that her doctor was still waiting to receive the FMLA paperwork from JPC.  (*Id.* at 145.)  Carter explained that she did not know what Snelling was talking about.  (*Id.*)

Around 3:00 p.m. on Wednesday afternoon, February 19th, Carter received an FMLA form (WH-380) filled out by someone at the clinic, either the PA or Dr. McClendon, indicating that Snelling "has been seen multiple times for insomnia, Anxiety Attacks, and depression [sic] to job stress."  (Def.'s Ex. 10; Snelling Dep., doc. 22, at 150.)  Several hours earlier, around 12:00 p.m., JPC had sent Snelling a separation notice by certified mail; Snelling received the notice two days later on Friday, February 21st.  (*Id.* at 153, 154; Def.'s Ex. 11.)  The separation notice stated: "Inasmuch as you have not reported for work consider

this as notice of your termination from your employment here." (Def.'s Ex. 11.) It is undisputed that the separation notice was mailed before Carter received Snelling's FMLA form WH-380. By the time Snelling received the separation notice, she had already turned in her work key, at the company's request. (*Id.* at 155.)

Snelling received a second letter from JPC on February 21st, which informed her about the procedure for obtaining medical and dental insurance coverage from COBRA Solutions. (*Id.* at 156-157; Def.'s Ex. 12.) The record reflects that JPC sent yet a third letter to Snelling by certified mail the same week; that letter, which was postmarked February 20th, was returned to JPC unclaimed after a number of failed delivery attempts.[6] (Def.'s Ex. 13.) Though Snelling concedes that the third letter was mailed to the correct address, she denies having ever received it or having ever been notified of the delivery attempts. Snelling allows that she may have seen it at an administrative hearing in front of the Georgia Department of Labor. (Snelling Dep., doc. 22, at 157, 160.) The unclaimed letter stated that JPC had not yet requested the termination of Snelling's medical insurance—even though her employment had been terminated—because JPC was in receipt of her FMLA form WH-380, and her FMLA leave request was still under review. (Def.'s Ex. 13.) However, JPC indicated in the letter that, in accordance with FMLA guidelines, Snelling would be required to provide JPC with a second medical certification to justify her FMLA leave request. (*Id.*) JPC asked

---

[6] Counsel for JPC states that this third letter was sent to Snelling by *regular* mail in addition to being sent by certified mail, but there is no evidence in the record to support that supposition. (Snelling Dep., doc. 22, at 160.) There has been no testimony by any JPC representative—whether by affidavit, declaration, deposition, or otherwise—that would corroborate JPC's counsel's claim that this letter was sent by regular mail.

Snelling to contact its office within 5 days to discuss setting up an appointment for the second certification.  (*Id*.)  Snelling does not recall ever contacting anyone at JPC about a second medical certification and, moreover, does not recall whether she was ever made aware that JPC had requested a second certification.  (*Id*. at 160.)

Other than returning to JPC to speak with her supervisors regarding the FMLA paperwork and to drop off her return-to-work certificates, her application for disability benefits, and her WH-380 form, Snelling never reported for work after she clocked out at 12:30 p.m. on February 12, 2003.  Snelling returned to the Eagle's Landing clinic on March 25, 2003, for a checkup regarding her depression and anxiety attacks.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986).  The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence.  **Id.** at 249.  Finally, "the evidence presented cannot consist of conclusory

allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

## III.  PARTIES' CONTENTIONS

JPC maintains that Snelling was terminated for job abandonment after she walked out of work unexpectedly on February 12th and never came back after February 15th, the date by which she was expected to be able to return according to the first return-to-work certificate she gave JPC.  JPC says it is entitled to summary judgment for four reasons: (1) Snelling's notice to JPC that she intended to take FMLA leave was neither timely nor sufficient under the FMLA; (2) there is no evidence that JPC "interfered" with any of Snelling's rights under the FMLA; (3) Snelling cannot establish that she suffered from a "serious health condition," as defined by the FMLA; and (4) Snelling's termination was unrelated to any request she may have made for FMLA leave.[7]  (Def.'s Mot. Summ. J., doc. 20, at 2.)

Snelling maintains that the oral and written communications she provided to JPC were both timely and sufficient, thereby putting JPC on notice both that she was claiming leave potentially protected by FMLA and that she was requesting such leave until March 31st.  She further contends that JPC interfered with her substantive rights under the statute by not granting her requested leave.  Finally, Snelling argues that there are disputed issues of material fact concerning whether she suffered from a serious health condition and whether she was terminated in retaliation for having taken time off work.

---

[7] JPC says that it addresses Snelling's retaliation claim "out of an abundance of caution," for it does not concede that she has stated such a claim in her complaint.

# IV.  DISCUSSION

As relevant to this suit, the FMLA permits an eligible employee to miss work for a total of 12 workweeks during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [his or her] position."  29 U.S.C.A. § 2612(a)(1)(D) (West 1999).  To protect this entitlement, the FMLA creates two causes of action: First, the FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise or the attempt to exercise any right" conferred upon the employee by the statute.  *See* 29 U.S.C.A. § 2615(a)(1) (this provision gives rise to what is known as an "interference" claim).  Second, the FMLA makes it unlawful for an employer "to discharge or in any other manner discriminate against any individual" for asserting his or her rights under the statute.  *See* 29 U.S.C.A. § 2615(a)(2) (this provision gives rise to what is known as a "retaliation" claim); *see* ***Strickland v. Water Works and Sewer Bd.***, 239 F.3d 1199, 1207 n.9 (11th Cir. 2001); *see* ***Stallings v. Hussman Corp.***, 447 F.3d 1041, 1050 (8th Cir. 2006) (distinguishing between "interference" claims and "retaliation" claims, but observing that "the lines between the two categories are not hard and fast").

"To establish an interference claim, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.  The employee need not allege that his employer intended to deny the benefit—the employer's motives are irrelevant."  ***Hurlbert v. St. Mary's Health Care Sys., Inc.***, 439 F.3d 1286, 1293 (11th Cir. 2006) (internal quotation marks omitted).

By contrast, a plaintiff bringing a retaliation claim must show "that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right;" thus, as a result, he "faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland*, 239 F.3d at 1207 (internal quotation marks omitted).  In the absence of direct evidence of the employer's intent, retaliation claims under the FMLA are subject to the same burden-shifting framework applicable to Title VII discrimination claims.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973).  To make out a prima facie case of retaliation under the FMLA, as under other federal anti-discrimination statutes, an employee must demonstrate that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) the decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207 (citation omitted).  If the employee can establish the prima facie elements, then the burden shifts to his employer to articulate a legitimate, non-discriminatory reason for the adverse action taken against him.  If the employer is able to come forward with such a reason, the burden shifts back to the employee to demonstrate that the employer's reason is pretextual.

JPC maintains that Snelling has pleaded only an "interference" claim in her complaint. (Def.'s Br. Supp. Mot. Summ. J., doc. 20, at 9 n.3.)  Snelling, on the other hand, contends that she has pleaded facts sufficient to support both an "interference" and a "retaliation" claim.  (Pl.'s Resp. to Def.'s Mot. Summ. J., doc. 25, at 17-18.)  Given the substance of

Snelling's complaint, and particularly the fact that Snelling alleges that JPC fired her in response to Snelling's exercising what was her statutory right to medical leave, the Court is satisfied, for the reasons discussed below, that Snelling has pleaded facts sufficient to support both an "interference" and a "retaliation" claim for relief. Each claim will be separately considered below.

## INTERFERENCE CLAIM

To prevail on her interference claim, Snelling must first demonstrate that she was entitled to the benefit of FMLA leave—that is, she must demonstrate that she gave proper notice to JPC and that she suffered from a "serious health condition." If she can do both of those things, she must then demonstrate that JPC denied her that benefit. The latter requirement is not at issue because it is undisputed that JPC never granted Snelling's request for FMLA leave.

**A.     Did Snelling Comply With the FMLA's Notice Requirements?**

An employee in need of FMLA leave must provide his or her employer with notice of the need for leave. As a general rule, if the need for leave is foreseeable, the employee must, if practicable, give his or her employer "not less than thirty days' notice, before the date of leave is to begin." 29 U.S.C.A. § 2612(e)(2)(B); 29 C.F.R. § 825.302(a). Where, as in Snelling's case, the need for leave is not foreseeable, notice to the employer must be given "as soon as practicable under the facts and circumstances of the particular case."[8] 29 C.F.R.

---

[8] JPC suggests that Snelling "manufactured" the "unforeseeable nature" of her need for leave by "abruptly" leaving work early on February 12th, *see* Def.'s Mot. Summ. J., doc. 20, at 10, but ultimately

§ 825.303(a).  Interpreting that provision, the Eleventh Circuit has held that "where an employee's need for FMLA leave is unforeseeable, the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a *potentially FMLA-qualifying reason.*"  **Cruz v. Publix Super Markets, Inc.**, 428 F.3d 1379, 1382 (11th Cir. 2005) (citation omitted).  Generally, it is expected that notice under these circumstances will be given "within no more than one or two working days of learning of the need for leave."  29 C.F.R. § 825.303(a).

Notice to the employer may be given in person or by other means, including fax or telephone.  29 C.F.R. § 825.303(b).  In giving notice of the need for leave, the employee need not expressly invoke the FMLA or mention it at all; rather, if the employee states to the employer that "leave is needed," the employer will thereafter "be expected to obtain any additional required information through informal means."  *Id.*; *see* **Strickland**, 239 F.3d at 1209 (recognizing that once notice has been given, "the regulations place on the employer the burden of ascertaining whether the employee's absence *actually* qualifies for FMLA protection") (emphasis added).

---

concedes for purposes of its summary-judgment motion that the "unforeseeable standard applies"—i.e. the notice provisions of 29 C.F.R. § 825.303.

1.      Timeliness

JPC argues that Snelling failed to give timely notice of her need to take medical leave. (Def.'s Mot. Summ. J., doc. 20, at 10-11.)  The evidence does not bear out this contention. To be eligible for leave, Snelling must have given JPC notice of the need for leave in a timely manner.   The issue of timeliness is distinct from the issue of the notice's substantive sufficiency and must by necessity be addressed first; if an employee's notice is not timely, there is no need to assess its sufficiency.

Snelling's need for medical leave, triggered as it was by a sudden anxiety attack and a near-simultaneous car accident, was unforeseen.  That much is not disputed.  As discussed above, FMLA's implementing regulations suggest that, in a situation like Snelling's involving an unforeseen need for leave, notice is generally "expected" to be given to the employer within one or two working days after the need arises.  *See* 29 C.F.R. § 825.303(a).  Here, the need arose on February 12th.  Apart from her daughter's telephone call to JPC on the 12th to tell them of the accident,[9] Snelling notified JPC that she was requesting leave on *three* separate occasions, none of which were more than three working days[10] after the accident.

First, on February 13th, Snelling went to JPC with a certificate stating that she had

_____

[9] The Court does not treat this telephone call as notice that Snelling intended to take FMLA leave. At best, from what the Court can tell from the record, the purpose of that call was merely to inform JPC that Snelling would not be able to return to work that afternoon.

[10] The time frame set forth in § 825.303(a)—one to two working days— is precatory only; it does not purport to establish a drop-dead date for providing notice, after which any such notice is fatally defective. As that provision indicates, timeliness must be considered in light of the "facts and circumstances of the particular case."

been, and would continue to be, under a doctor's care from February 12th to 14th, and that she would be unable to return to work until the 15th.[11]  She told Lewis that she had suffered an anxiety attack and that her health care provider wanted to put her on leave.  While at JPC on the 13th, Snelling asked if Millwood could give her the appropriate FMLA paperwork to fill out and return.  Snelling was told the forms could not be found, but to come back later.  She came back later that day.  The paperwork still could not be located.

Snelling returned to JPC the following morning, on February 14th, with a note written by her PA reminding her what paperwork she needed to pick up for purposes of obtaining FMLA leave.  She gave the note to Carter.  The note stated: "Family medical leave act paperwork" and "short term Disability paperwork."  In response to the note, Carter provided Snelling with the short term disability paperwork and "a copy of the family medical leave act."[12]  (Def.'s Ex. 6.)

Finally, on February 17th, Snelling spoke with Carter on the phone and requested the FMLA paperwork yet again.  She thereafter returned to JPC in person for a third time, this time equipped with a second return-to-work certificate from her health care provider.  This certificate, signed on the 17th, stated that Snelling had been, and would continue to be, under a doctor's care until March 31st and would be unable to return to work until that time.

---

[11] February 15th fell on a Saturday in 2003.  Snelling did not work on Saturdays.  Thus, her next regularly scheduled workday would have been Monday, February 17th.  (Snelling Dep., doc. 22, at 143.)

[12] Carter provided Snelling with a one-page summary (Department of Labor form WH-1420) of the FMLA's major provisions.  (Def.'s Ex. 7.)

(Def.'s Ex. 16.)  This second certificate effectively alerted JPC that Snelling was requesting leave until the end of March.  JPC denies ever having received this certificate from Snelling, claiming that it became aware of it for the first time only at a disability hearing at the end of April.  There is thus a disputed issue of fact concerning whether Snelling ever provided this note to JPC and whether JPC ever received it from her.  For the reasons discussed below, that disputed factual issue is material to the FMLA claims.

Taking the evidence in the light most favorable to Snelling, and resolving all evidentiary doubts in her favor, the Court finds that Snelling timely notified JPC "that leave [wa]s needed."  29 C.F.R. § 825.303(b).

## 2.    Sufficiency

Having determined that Snelling provided timely notice to JPC, the Court must now consider whether that notice was sufficient to shift the burden of inquiry to JPC, *see Strickland*, 239 F.3d at 1209—that is, whether the substance of the notice was "sufficient to make the employer aware that her absence is due to a *potentially FMLA-qualifying reason*." *Cruz*, 428 F.3d at 1382.  JPC argues that Snelling's notice was insufficient because: (1) she did not provide JPC with enough information from which to evaluate the status of her health condition, and (2) she did not respond to JPC's February 21st request for a second medical certification, a request that was sent to Snelling by certified mail at her correct address but never claimed.  (Def.'s Br. Supp. Mot. Summ. J., doc. 20, at 12-15.)

JPC's arguments on this point appear to conflate two separate inquiries—(1) whether

an employee has provided her employer with information sufficient to show that her stated reason for leave *potentially* qualifies for FMLA protection (thus shifting to the employer an obligation to investigate further) and (2) whether an employee has provided her employer with information sufficient to show that her stated reason for leave *actually* qualifies for FMLA protection (in other words, whether the employee can demonstrate that she in fact suffers from a "serious health condition" as that phrase is defined by statute and regulation). While JPC's insufficient-notice arguments tend to focus on the second of these inquiries, an employee's notice is sufficient for FMLA purposes if it satisfies only the first. *See Cruz*, 428 F.3d at 1383 ("Once an employee gives sufficient notice to her employer that *potentially* FMLA-qualifying leave is needed, the employer must then ascertain whether the employee's absence *actually* qualifies for FMLA protection.")

The notice provided by Snelling in this case was sufficient to show that her stated need for leave was *potentially* protected by FMLA. She informed her superiors at JPC that she was under a doctor's care for anxiety attacks that her health care provider had determined were severe enough to preclude her from working at JPC for at least a month.[13]  Two days after requesting this extended leave, she presented JPC with FMLA form WH-380, which indicated that "Pt has been seen multiple times for insomnia, Anxiety Attacks, and depression [sic] to job stress."  (Def.'s Ex. 10.)  The form further indicated that the duration

_____

[13] As discussed, Snelling testified that she provided JPC with a return-to-work certificate on February 17th stating that she would need to be absent from work until March 31st.  Again, JPC denies ever receiving this note, but at the summary-judgment stage the Court must resolve this disagreement in favor of Snelling, the nonmoving party.

-19-

of Snelling's incapacity was unknown, that she was unable to perform work of any kind, and that she was under a regimen of continuing treatment consisting of "multiple prescription medications to combat the problem."   (*Id.*)   The Court concludes that this is enough information to put JPC on notice that Snelling *may have* been suffering from a "serious health condition" within the meaning of the statute and its implementing regulations.  *See* 29 U.S.C.A. § 2611(11); 29 C.F.R. § 825.114.  Thus, JPC was tasked with investigating whether Snelling *actually* suffered from such a condition.

**B.    Did Snelling Fail to Comply with JPC's Request for a Second Medical Certification?**

JPC claims that it made a good-faith effort to investigate the basis for Snelling's requested leave, but that she refused to cooperate.  As a result, JPC argues that it is entitled to summary judgment on Snelling's interference claim because failure to comply with an employer's request for a second medical certification has been held to deprive an employee of the right to leave under the statute.  *See **Diaz v. Fort Wayne Foundry Corp.**,* 131 F.3d 711, 713 (7th Cir. 1997) ("An employee who fails to cooperate with the second-opinion process under § 2613(c) loses the benefit of leave under § 2612(a)(1)(C) or (D)").

As an initial matter, the Court notes that an employer faced with an employee's request for FMLA leave "may" require that the employee support his or her request by providing a (first) medical certification prepared by the employee's health care provider.  *See* 29 U.S.C.A. § 2613(a).  In this case, JPC did not request from Snelling a first medical certification. Instead, Snelling presented to JPC on Wednesday, February 19th an *unsolicited*

-20-

medical certification prepared by her health care provider.  The form Snelling delivered to JPC (form WH-380, prepared by the Department of Labor) constitutes a medical certification within the meaning § 2613(a).  *See* 29 C.F.R. § 825.306.

If, however, after receiving an initial certification, an employer "has reason to doubt [its] validity," the employer "may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer." 29 U.S.C.A. § 2613(c)(1).  That is what JPC attempted to do in this case.  JPC made an effort to utilize the FMLA's second-opinion provision by requesting, in a letter sent to Snelling's home by certified mail on February 20th, that Snelling contact the office to schedule a second medical certification.  JPC's letter stated that: "[W]e are reviewing [your FMLA leave] request" but "[p]ursuant to FMLA provisions, we will require a second medical certification and ask that you contact this office . . . within 5 days to discuss scheduling this appointment."  (Def.'s Ex. 13.)  That is all the letter said with respect to JPC's request for a second certification.  Snelling never contacted JPC's office as instructed because, as she testified in her deposition, she never received the letter and thus did not know that JPC was requesting a second certification.  The record supports Snelling's undisputed explanation, showing that the letter was returned to JPC unclaimed.[14]  (*Id.*)  The failure to ensure that its

---

[14] Moreover, there is nothing in the record to indicate that notices of attempted deliveries were left at Snelling's home.  JPC argues that the Court should presume, as a matter of law, that Snelling received this letter, despite her testimony to the contrary, because JPC (1) sent the letter by *regular* mail (2) to Snelling's *correct* address and (3) it was *not returned* to JPC.  JPC further contends that Snelling "cannot dispute the letter sent by regular mail was never returned."  (Def.'s Br. Supp. Mot. Summ. J., doc. 20, at 12 n.4.)  However, Snelling is under no obligation to "dispute" JPC's assertion because, as noted above at *supra* n.6, there is no evidence to support the

request for a second medical certification was actually communicated to Snelling puts JPC in the same position as if it had never made the request at all.[15]   Unable to show that Snelling had notice of its request, JPC cannot assert her noncompliance with that request as a reason why it is entitled to prevail as a matter of law on her interference claim.

Nevertheless, JPC is still free to challenge Snelling's entitlement to leave under the Act.  The failure of an employer to follow through on its request for a second certification does not preclude the employer from later disputing (in this litigation, for example) that the employee suffered from a "serious health condition" as defined by the FMLA.  *See **Stekloff v. St. John's Mercy Health Sys.**,* 218 F.3d 858, 860 (8th Cir. 2000) (employer's failure to request second certification does not foreclose challenge to issue of whether employee has "serious health condition"); *see **Rhoads v. F.D.I.C.**,* 257 F.3d 373, 385 (4th Cir. 2001) (same; adopting reasoning of ***Stekloff***).  In arguing for summary judgment, JPC does in fact challenge Snelling's contention that she suffered from a serious health condition.

---

contention that this letter was sent by regular mail.  Thus, any argument relying on the legal fiction of constructive receipt must fail.

[15] As the Supreme Court recently noted: "[The] use of certified mail makes actual notice more likely [only] when someone is home to sign for the letter, or to inform the mail carrier that he has arrived at the wrong address.  Otherwise . . . the use of certified mail might make actual notice less likely in some cases—the letter cannot be left like regular mail to be examined at the end of the day, and it can only be retrieved from the post office for a specified period of time." *Jones v. Flowers*, 126 S. Ct. 1708, 1719 (2006).

C.      **Did Snelling Suffer From a Serious Health Condition?**

A "serious health condition" is defined by the FMLA as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C.A. § 2611(11).  It is undisputed that Snelling did not receive inpatient care for her anxiety attacks and depression.  Thus, if she suffered a serious health condition it is because she received "continuing treatment by a health care provider."

As the Eleventh Circuit recognized in **Russell v. North Broward Hosp.**, 346 F.3d 1335, 1342 (11th Cir. 2003):

> The FMLA does not define "continuing treatment by a health care provider," but the Department of Labor has issued a regulation defining that phrase, in relevant part, as follows:
>
>> (2) *Continuing Treatment* by a health care provider.  A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>> (i) *A period of incapacity* (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of *more than three consecutive calendar days*, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>> (A) Treatment two or more times by a health care provider, by a nurse or a physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or
>> (B) Treatment by a health care provider on at least one occasion which results in *a regimen of continuing treatment* under the supervision of the health care provider.

*Id.* (citing 29 C.F.R. § 825.114(a)(2)(i)) (final emphasis supplied). "A regimen of continuing treatment," under subsection (a)(2)(i)(B), "includes, for example, a course of prescription medication." 29 C.F.R. § 825.114(b); *see **Hurlbert v. St. Mary's Health Care Sys., Inc.**,* 439 F.3d 1286, 1295 n.11 (11th Cir. 2006).

JPC advances several arguments about why Snelling was not under "continuing treatment" (and thus not suffering from a "serious health condition"). First, JPC argues that the return-to-work certificate Snelling provided on February 13th stated that she would be unable to work for only three days (13th, 14th, and 15th)—not "*more than* three consecutive calendar days" as required by § 825.114(a)(2)(i). This argument ignores Snelling's testimony that she delivered to JPC a second return-to-work certificate on February 17th, which stated that she would be unable to return to work until March 31st—a period of incapacity (inability to work) well exceeding the regulation's "more than three consecutive calendar days" requirement. Though JPC has chosen to overlook Snelling's purported delivery of the second return-to-work certificate, the Court cannot. It must consider the record in the light most favorable to Snelling and resolve any disputes in her favor. The dispute over the receipt of the second return-to-work certificate is a genuine issue of material fact, which precludes summary judgment in favor of JPC on Snelling's interference claim.

JPC next argues that Snelling could not have been under continuing treatment because she went to the clinic for treatment only twice in a six-week period—once for the initial visit on February 12th and once for a follow-up visit on March 25th. JPC contends

that Snelling's condition could not have been serious enough to warrant leave because she waited so long in between visits. JPC appears to be saying that if Snelling's anxiety attacks and depression were as "serious" as she maintained, she would have sought treatment more frequently. This argument is beside the point, however, because the phrase "serious health condition" is defined objectively, not subjectively. *See* ***Russell v. North Broward Hosp.***, 346 F.3d 1335, 1345 (11th Cir. 2003) (citing ***Thorson v. Gemini, Inc.***, 205 F.3d 370, 380 (8th Cir. 2000)). That is, if an employee can meet the definition of "serious health condition" prescribed by the FMLA regulations, neither employers nor courts may legitimately take issue with the subjective seriousness of the condition. ***Id.*** In any event, JPC's argument overlooks the fact that Snelling's initial visit on February 12th "result[ed] in a regimen of continuing treatment," *id.* § 825.114(a)(2)(i)(B), in that she was put on a new "course of prescription medication;" *id.* § 825.114(b)—namely, an increased dosage of Effexor.

Finally, JPC argues that "Ms. Snelling essentially admitted in her deposition that she did not suffer from a serious health condition" because she testified that she "'could work but not at Jones Petroleum.' [She] could work 'anywhere else.'" (Def.'s Br. Supp. Mot. Summ. J., doc. 20, at 18.) JPC calls this condition "Jones Petroleum-itis" and concludes that because Snelling could have worked at some *other* job, she did not have an "inability to work," *see* 29 C.F.R. § 825.114(a)(2)(i), and therefore did not have a serious health condition. This proposition is incorrect as a matter of law; the Eleventh Circuit rejected this very argument

in an opinion issued shortly after JPC filed its summary-judgment motion. *See **Hurlbert***, 439 F.3d at 1295 ("[W]e hold that a demonstration that an employee is unable to work in his or her *current job* due to a serious health condition is enough to show that the employee is incapacitated, *even if that job is the only one the employee is unable to perform*.") (quoting ***Stekloff***, 218 F.3d at 861).

Viewing the evidence in the light most favorable to Snelling, the Court cannot conclude as a matter of law that Snelling did not receive continuing treatment from a health care provider. *See* 29 U.S.C.A. § 2611(11)(B); 29 C.F.R. § 825.114(a)(2). Snelling must prove that she received continuing treatment from a health care provider to prevail on her FMLA interference claim. She has created a genuine issue of material fact on the question whether she was incapacitated for more than three calendar days and, accordingly, on the question whether she suffered a "serious health condition," as that phrase is defined by the FMLA regulations.

JPC's motion for summary judgment on Snelling's interference claim is therefore denied.

## RETALIATION CLAIM

The Court is not quite sure what to make of the following statement in JPC's summary-judgment brief: "Plaintiff's complaint does not state a retaliation claim." (Def.'s Br. Supp. Mot. Summ. J., doc. 20, at 19.) JPC contends in both its moving brief and its reply brief that the Court should refuse to entertain any such claim because "the time to amend

[the complaint] has long since passed." (*Id.*)  To state a claim for relief in federal court, a plaintiff need not spell out in so many words "I am asserting claim X."  Nor must she affix magic words or a particular label to her claim in order to bring it to the Court's or the defendant's attention.  Such a pleading standard would undermine both the text and purpose of Federal Rule of Civil Procedure 8(a)'s "short and plain" statement rule, which of course was meant to do away with code-pleading requirements in favor of a more relaxed regime of notice pleading.  *See* Fed. R. Civ. P. 8(a) (West 2005); *see also* **Simpson v. Nickel**, 450 F.3d 303, 305 (7th Cir. 2006) ("plaintiffs need not allege either the factual or legal 'elements' of a prima facie case under the employment-discrimination laws") (citing **Swierkiewicz v. Sorema N.A.**, 534 U.S. 506 (2002)); **Doe v. Smith**, 429 F.3d 706, 708 (7th Cir. 2005) ("Plaintiffs need not plead facts; they need not plead law; they plead claims for relief.  Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of."); **Kolupa v. Roselle Park Dist.**, 438 F.3d 713, 714 (7th Cir. 2006).  The question, then, is not whether Snelling should be permitted to amend her complaint to add a new claim; rather, the question is whether a claim for relief based on a theory of retaliatory discharge is evident from the allegations in her complaint.[16]  The Court

---

[16] JPC points to the Eleventh Circuit's decision in **Hurlbert v. St. Mary's Health Care Sys., Inc.**, 439 F.3d 1286 (11th Cir. 2006), as providing a basis for rejecting Snelling's retaliation claim.  But **Hurlbert** is distinguishable.  There, the plaintiff's complaint alleged that *he* suffered from a serious health condition and that, as a result, he was entitled to FMLA leave.  439 F.3d at 1297.  At the summary-judgment stage in the district court, however, the plaintiff tried to shift the focus of his lawsuit by arguing that he was entitled to relief under FMLA because *his mother* suffered from a serious health condition and he had to take leave to care for her.  *Id.* at 1296-97.  The plaintiff did not allege in his complaint that his mother suffered from a serious health condition.  *Id.* at 1297.  The district court rejected the plaintiff's argument and the Eleventh

finds that it is.

Snelling's complaint alleges that she was entitled to FMLA leave, that JPC denied her that leave, and that JPC ultimately terminated her employment because she took the leave anyway. (Compl. ¶¶ 4–12 [sic ¶ 9].) That is enough to "state a retaliation claim." Count I of Snelling's complaint is labeled "INTERFERENCE WITH RIGHTS TO LEAVE IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT." (Compl. at 5.) JPC points out, and the Court acknowledges, that the word "retaliation" is not contained in the label under Count I or anywhere else in Snelling's complaint. But it need not appear there. Indeed, for that matter, the word "retaliation" makes no appearance in the statutory provision from which the claim derives. *See* 29 U.S.C.A. § 2615(a)(2). Labels in a party's pleadings are not controlling, and, in any event, the narrative facts recounted throughout the remainder of the complaint are such that the Court cannot say as a matter of law that Snelling is not entitled to offer proof that she was retaliated against in violation of § 2615(a).[17]

---

Circuit affirmed because the plaintiff had "effect[ed] a fundamental change in the nature of [his] interference claim" but had "proceeded through discovery without amending (or seeking to amend) his complaint to reflect that fundamental change." *Id.* at 1297. Central to the court's holding in *Hurlbert*, and what distinguishes it from this case, was the fact that the plaintiff's complaint "provided *no notice whatsoever* that he believed he was entitled to leave on this basis." *Id.* (emphasis supplied). Here, Snelling's complaint provided ample notice that she thought she was entitled to relief for being terminated in violation of the statute. Thus, by arguing her retaliation claim at summary judgment, she has not "effected a fundamental change" in the nature of the relief sought in her complaint, and the rules of procedure dealing with amended pleadings have no application here.

[17] The Eleventh Circuit has said that "*to state a claim of retaliation*, an employee *must allege* [the prima facie elements of the claim]." *Strickland*, 239 F.3d at 1207. However, to the extent that that statement can be read to require a plaintiff to allege a prima facie case of discrimination in his complaint, that statement

A.      **Circumstantial Evidence of Retaliation**

Despite Snelling's argument to the contrary, her retaliation claim is not supported by direct evidence of discrimination.  Direct evidence is evidence that, if believed, would establish a fact in issue (here, that JPC terminated Snelling's employment with the intent of retaliating against her for exercising her FMLA rights) without inference or presumption. The Court has not been presented with evidence of that sort.  Instead, Snelling's claim relies on circumstantial evidence of discrimination.  As noted above, where direct evidence of discrimination is lacking, a plaintiff must pursue her retaliation claim under the burden-shifting framework set forth in ***McDonnell Douglas***.  Snelling must first make out a prima facie case of retaliation.  If she is successful, then a presumption of discrimination arises and the burden will shift to JPC to come forward with a legitimate, non-discriminatory reason for taking an adverse employment action against her.   If JPC succeeds in rebutting the presumption of discrimination, the burden will shift back to Snelling to show that JPC's reason was pretextual.

---

is inconsistent with the Supreme Court's decision in ***Swierkiewicz v. Sorema N.A.***, 534 U.S. 506, 515 (2002), in which the Court held that "an employment discrimination plaintiff *need not plead a prima facie case* of discrimination [in his complaint]."  While it is clear that the pleading standard set forth in ***Swierkiewicz*** "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage," ***Gilmour v. Gates, McDonald and Co.***, 382 F.3d 1312, 1314 (11th Cir. 2004), it is equally clear that Snelling's retaliation claim  is not being raised for the first time at summary judgment; the facts giving rise to the claim were pleaded in her complaint, and that is what counts.

1.      **The Prima Facie Case**

To make out a prima facie case of retaliation under the FMLA, a plaintiff must demonstrate that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) the decision was causally related to the protected activity." *Strickland*, 239 F.3d at 1207 (citation omitted).

Snelling has no problem establishing the second element—termination is an adverse employment action. *See* ***Hurlbert***, 439 F.3d at 1298 ("[Plaintiff's] termination is certainly an adverse employment action"); *see* ***Brungart v. BellSouth Telecomm., Inc.***, 231 F.3d 791, 798 (11th Cir. 2000) ("[Plaintiff] suffered the adverse employment action of being discharged."). Regarding the first element, to the extent that she has created a genuine issue of material fact on her interference claim (whether she suffered from a "serious health condition"), she has also created a genuine issue of material fact on her retaliation claim (whether she engaged in statutorily protected activity)—that is, because there is evidence from which reasonable jurors could conclude that Snelling suffered from a serious health condition, there is evidence from which reasonable jurors could conclude that she engaged in protected activity by taking time off work on account of that condition. *See* ***Hurlbert***, 439 F.3d at 1298 (by "rais[ing] genuine issues of material fact on whether [plaintiff] was entitled to leave . . . [plaintiff] likewise raised genuine issues of material fact on whether he engaged in statutorily protected activity under FMLA."); *see also* ***Russell v. North Broward Hosp.***, 346 F.3d 1335, 1340 (11th Cir. 2003) ("Interference and retaliation claims both require the employee to establish a

'serious health condition'"). So it is to the third element that the Court now turns.

The critical inquiry regarding the third element of the prima facie case is whether Snelling has produced sufficient evidence to create a genuine issue of material fact that her request for FMLA leave caused JPC to terminate her, "which means: could a jury reasonably find from the evidence presented [ ] that [Snelling] was fired because she sought FMLA leave?" *Brungart*, 231 F.3d at 798.

> As the Eleventh Circuit noted in *Brungart:*
>
> To establish the causal connection element, a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated. In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him. As with most facts, the defendant's awareness can be established by circumstantial evidence.

231 F.3d at 799 (internal citations and quotation marks omitted).

With regard to the causal connection element, courts pay particular attention to the temporal proximity between the protected activity and the adverse action. As a general rule, if the temporal proximity is close, with the protected activity preceding the adverse employment action, the issue of causation will be one for a jury to decide. *See Hurlbert*, 439 F.3d at 1298 ("Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (internal quotation marks omitted); *see Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995) ("Proximity in time is

sufficient to raise an inference of causation."). But where there is "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct," an exception to the general rule applies and a court may conclude as a matter of law that the two events are not causally related. *See Brungart*, 231 F.3d at 799.

In this case, JPC contends that the decision to terminate Snelling's employment was made at 12:00 p.m. on Wednesday, February 19th when the separation notice was mailed out—three hours *before* it received the WH-380 form, the moment at which it claims it knew for the first time that Snelling was asserting her rights under the FMLA. JPC argues that it could not have terminated her in retaliation for her engaging in an FMLA-protected activity because it did not even know at the time that she was requesting FMLA leave. This assertion does not stand unrebutted though, so the exception to the general rule does not apply.

Viewing the facts in the light most favorable to Snelling, the record indicates that she delivered to JPC on Monday, February 17th a return-to-work certificate explaining that she would need to be out of work on the advice of her health care provider until March 31st. Several days prior to that, on February 13th, she informed her supervisor, Lewis, that she had had an anxiety attack, that she had seen her health care provider, and that her health care provider wanted to put her on medical leave. Because Snelling testified that she requested leave until March 31st, because she was terminated a mere two and a half days *after* that request, and because JPC denies having received the second return-to-work certificate, there are genuine issues of material fact regarding whether JPC knew that Snelling was requesting

-32-

FMLA leave at the time they decided to terminate her and, thus, whether her termination was caused by her request.  Furthermore, because Snelling has created a genuine issue of material fact on the third element of her prima facie case, the burden now shifts to JPC to come forward with a legitimate, non-discriminatory reason for firing her.

### 2.    The Legitimate, Non-Discriminatory Reason

The sole reason given by JPC for its decision to fire Snelling is "job abandonment." (Def.'s Br. Supp. Mot. Summ. J., doc 20, at 20; Def.'s Reply Br. Supp. Mot. Summ. J., doc 29, at 7).  JPC contends that Snelling requested leave until February 15th (which was a Saturday; her next scheduled work day was Monday, February 17th), and when she did not report to work after that date the company deemed Snelling to have "abandoned" her job and fired her on Wednesday, February 19th.  (Separation Notice, Def.'s Ex. 11) ("*Inasmuch as you have not reported for work* consider this your termination from your employment here.") (emphasis added).[18]  JPC has thus met its burden to come forward with a legitimate, non-discriminatory reason for its discharge decision.  The burden thus returns to Snelling to demonstrate why the "job abandonment" reason is pretext for discrimination.

### 3.    Pretext

Snelling argues that the "job abandonment" reason given by JPC is pretextual because JPC knew at the time it terminated her that she had requested FMLA leave until March 31st

---

[18] JPC's employee handbook states: "The failure to return to work at the end of an authorized leave of absence is considered a voluntary termination without notice."  (Def.'s Ex. 1, at 5.)

and that she was therefore lawfully entitled to miss work.  That is, Snelling maintains that she could not have "abandoned" her job because she a right not to be there.  In response, JPC maintains that it must be granted summary judgment on Snelling's retaliation claim because "Plaintiff has offered no evidence to rebut the company's legitimate non-retaliatory reason for terminating her employment (i.e. "job abandonment").  (Def.'s Reply Br. Supp. Mot. Summ. J., doc. 29, at 7.)  But, of course, Snelling has rebutted that contention.  She has produced her own testimony that she delivered a return-to-work certificate to JPC on Monday, February 17th, signed by her health care provider, which stated that she would be unable to return to work until March 31st.  This evidence, when considered in light of the fact that "job abandonment" was the sole reason given for Snelling's termination, is sufficient to create a genuine issue of material fact on the issue of pretext.

Accordingly, with respect to Snelling's retaliation claim, JPC's motion for summary judgment is denied.

## V. CONCLUSION

Snelling has created a genuine issue of material fact on the question whether she suffered from a "serious health condition" as that phrase is defined by the FMLA's implementing regulations.  Snelling has also created a genuine issue of material fact on the first and third elements of her prima facie retaliation claim and on the question whether JPC's legitimate, non-discriminatory reason for firing her was pretext for discrimination. For those reasons, JPC's motion for summary judgment (doc. 20) is hereby **DENIED.**

SO ORDERED, this 24th day of July, 2006.

/s/ **Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew